# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF ARKANSAS
# JONESBORO DIVISION

JOE WILLIE LOVE                                                                              PLAINTIFF

V.                                    NO. 3:10CV00148 JTR

MICHAEL J. ASTRUE,
Commissioner, Social
Security Administration                                                                      DEFENDANT

## MEMORANDUM AND ORDER

### I. Introduction

Plaintiff, Joe Willie Love, has appealed the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying his claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Both parties have filed Appeal Briefs (docket entries #11 and #12), and the issues are now joined and ready for disposition.

The Court's function on review is to determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole and whether it is based on legal error. *Long v. Chater,* 108 F.3d 185, 187 (8th Cir. 1997); *see also* 42 U.S.C. § 405(g). While "substantial evidence" is that which a reasonable mind

might accept as adequate to support a conclusion,[1] "substantial evidence on the record as a whole" requires a court to engage in a more scrutinizing analysis:

> "[O]ur review is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision; we also take into account whatever in the record fairly detracts from that decision." *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). Reversal is not warranted, however, "merely because substantial evidence would have supported an opposite decision." *Shannon v. Chater*, 54 F.3d 484, 486 (8th Cir. 1995).

*Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005).

On November 17, 2005, Plaintiff filed applications for DIB and SSI, alleging a disability onset date of March 6, 2003. (Tr. 89-91). In a "Disability Report - Adult," he alleged disability based on "severe back problems." (Tr. 108). After his claims were denied at the initial and reconsideration levels, he requested a hearing before an ALJ.

On November 27, 2007, the ALJ conducted an administrative hearing, during which Plaintiff testified. (Tr. 463-483). At the time of that hearing, he was fifty-years old, and had completed the tenth grade. (Tr. 466). He had past work experience as a tire service technician. (Tr. 466).

The ALJ considered Plaintiff's impairments by way of the familiar five-step sequential evaluation process. Step 1 involves a determination of whether the

---

[1] *Reynolds v. Chater*, 82 F.3d 254, 257 (8th Cir. 1996).

claimant is involved in substantial gainful activity ("SGA"). 20 C.F.R. § 404.1520(a)(4)(I) (2005), §416.920. If the claimant is, benefits are denied, regardless of medical condition, age, education, or work experience. *Id.*, § 404.1520(b), § 416.920.

Step 2 involves a determination, based solely on the medical evidence, of whether the claimant has a "severe" impairment, *i.e.*, an impairment or combination of impairments which significantly limits the claimant's ability to perform basic work activities. *Id.*, § 404.1520(4)(ii), § 416.920. If not, benefits are denied. *Id.*

Step 3 involves a determination, again based solely on the medical evidence, of whether the severe impairment(s) meets or equals a listed impairment which is presumed to be disabling. *Id.*, § 404.1520(a)(iii), § 416.920. If so, and the duration requirement is met, benefits are awarded. *Id.*

Step 4 involves a determination of whether the claimant has sufficient RFC, despite the impairment(s), to perform the physical and mental demands of past relevant work. *Id.*, § 404.1520(4)(iv), § 416.920. If so, benefits are denied. *Id.*

Step 5 involves a determination of whether the claimant is able to make an adjustment to other work, given claimant's age, education and work experience. *Id.*, § 404.1520(4)(v), § 416.920. If so, benefits are denied; if not, benefits are awarded. *Id.*

In his December 27, 2007 decision (Tr. 10-17), the ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity since his alleged onset date; (2) had severe impairments consisting of degenerative disc disease; (3) did not have an impairment or combination of impairments meeting a Listing; (4) had the RFC to perform sedentary work; (5) could not perform his past relevant work; and (7) based on an application of the Medical-Vocational Guidelines, Plaintiff was disabled effective March 30, 2007, when he was "closely approaching advanced age." (Tr. 12-15). Thus, for the time period preceding March 30, 2007, the ALJ concluded that Plaintiff was not disabled.[2]

On July 21, 2010, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, thereby making it the final decision of the Commissioner. (Tr. 1-3). Plaintiff then filed his Complaint appealing that decision to this Court. (Docket entry #2).

## II. Analysis

In Plaintiff's Appeal Brief (docket entry #11), he argues that the ALJ erred: (1)

---

[2]For the time period preceding March 30, 2007, plaintiff was a "younger individual" between age 44-49, for which the Medical-Vocational Guidelines directed a finding of "not disabled." (Tr. 15).

For purposes of this appeal, the time period at issue for Plaintiff's DIB claim is from his alleged onset date, March 6, 2003, through March 29, 2007. The time period at issue for Plaintiff's SSI claim is from the date of his application, November 17, 2005, though March 29, 2007.

in assessing his RFC for sedentary work; and (2) in applying the Medical-Vocational Guidelines.  For the reasons discussed below, the Court concludes that Plaintiff's second argument has merit.

### A. Hearing Testimony and Medical Evidence

Plaintiff injured his back on March 6, 2003, while changing an earth-mover tire at work.[3] (Tr. 468-69). He testified that he had two back surgeries and that after the second surgery, his pain worsened. *Id.*   He could stand and walk for two to three hours in a 8-hour work day. (Tr. 472). He could not sit for more than an hour. (Tr. 472).

On March 31, 2003, Dr. Harold Knight, an orthopedic surgeon, restricted Plaintiff "to 5 pounds continuous lifting, 10 pounds intermittent lifting and two hours of continuous sitting, 2 hours of continuous standing, 2 hours of continuous walking; and . . . from climbing, kneeling, bending, stooping, twisting, pushing/pulling, reaching, lifting over the shoulder activity, driving at work, and operating machinery." (Tr. 414). On April 3, 2003, Plaintiff underwent a lumbar MRI showing  "severe central stenosis at L4-L5 due to a combination of disc degeneration, bulge, and central disc protrusion combined with a narrow spinal canal." (Tr. 307).

---

[3]It appears that Plaintiff received some workers' compensation benefits for his injury. (Tr. 68-72).

.
.
.

On October 13, 2003, Dr. Jerry Sorenson, a neurosurgeon, performed a diskectomy at L4-L5, a laminectomy at L4, and partial laminectomies at L3 and L5. (Tr. 238-39). Plaintiff's postoperative diagnosis was lumbar stenosis. (Tr. 238).

On February 23, 2004, Plaintiff underwent a lumbar epidural block, based on his continued complaints of back pain and diagnoses of "lumbar postlaminectomy syndrome" and lumbar radiculopathy. (Tr. 302).

On April 14, 2004, Plaintiff underwent a lumbar x-ray showing moderate joint space narrowing at L4-L5. (Tr. 205). On May 27, 2004, Plaintiff underwent a lumbar MRI showing a "probable recurrent disc L4 right paracentral." (Tr. 283).

On July 30, 2004, Dr. John Brophy, a neurosurgeon, performed a "reoperation bilateral L4-5 diskectomy." (Tr. 226). Plaintiff's postoperative diagnosis was "lumbar radiculopathy secondary to left paracentral recurrent L4-5 herniate nucleus." (Tr. 238). On August 10, 2004, Plaintiff followed up with Dr. Brophy, who recommended that Plaintiff "remain off work with a follow-up evaluation at approximately four weeks," and that he "initiate a slow, gradual walking home exercise program." (Tr. 253).

On September 9, 2004, Dr. Brophy "cleared [Plaintiff] to return to work at light duty with no lifting over 10 pounds and no repetitive stooping or bending[.]" (Tr. 254). On October 7, 2004, Dr. Brophy "cleared [Plaintiff] to return to work with a 20 pound lifting restriction, with no repetitive stooping or bending." (Tr. 255). They also

"discussed the issue of eventual clearance to return to work with a 40 pound lifting restriction." *Id.*

On October 25, 2004, Dr. Brophy noted that Plaintiff had not been participating in a walking exercise program. (Tr. 256). "Based on [Plaintiff's] perceived inability to return to work, I have suggested [a] screening evaluation with [a] lumbar MRI to rule out [a] structural problem. He is cleared to return to work at sedentary duties, with no lifting over ten pounds and no repetitive stooping or bending until his follow-up evaluation after the MRI." (Tr. 256).

On October 27, 2004, Plaintiff underwent a lumbar MRI which showed "an enhancement of the L4-L5 disk space which is likely mechanical in etiology." (Tr. 263). On November 15, 2004, Dr. Brophy read the MRI to show "no evidence of recurrent HNP or residual nerve root compression." (Tr. 257). He also noted that Plaintiff had "done nothing in an effort to identify some form of alternative employment, although we have had this discussion on multiple occasions. I have suggested progression of his home walking exercise program . . . [h]e is cleared to return to work with a 20 pound lifting restriction and no repetitive stooping or bending. (Tr. 257).

On November 18, 2004, Plaintiff attended work treatment therapy, but after two squats he said that his back "really hurt" and that he had to get some air. His therapist

called his doctor's office, and Plaintiff was told to go to the ER. Plaintiff went to the ER but was not admitted. (Tr. 433).

On November 29, 2004, Dr. Brophy read a postoperative MRI of Plaintiff's spine to show "no definite evidence of residual nerve root compression." (Tr. 258). On February 28, 2005, Dr. Brophy "cleared [Plaintiff] to return to work with a permanent 40 pound lifting restriction." (Tr. 262).

### B.     The ALJ's Application of the Medical-Vocational Guidelines

Plaintiff argues that the ALJ erred in applying the Medical-Vocational Guidelines (the "Grids") to conclude, at Step 5, that he was not disabled. Plaintiff acknowledges that, when a nonexertional impairment such as pain does not diminish a claimant's ability to do the "full range" of "Guidelines-listed activities," the Grids may still be used.[4] However, he contends that his pain prevented him from performing the "full range" of sedentary work, and that the ALJ's credibility analysis

---

[4] "Generally, where the claimant suffers from a nonexertional impairment such as pain, the ALJ must obtain the opinion of a vocational expert instead of relying on the Medical-Vocational Guidelines. However, the Guidelines still may be used where the nonexertional impairments do not diminish or significantly limit the claimant's residual functional capacity to perform the full range of Guideline-listed activities. In particular, when a claimant's subjective complaints of pain are explicitly discredited *for legally sufficient reasons articulated by the ALJ*, the Secretary's burden at the fifth step may be met by use of the Medical-Vocational Guidelines." *Baker v. Barnhart*, 457 F.3d 882, 894-95 (8th Cir. 2006) (internal quotations and alterations omitted) (emphasis added).

was flawed. Thus, Plaintiff's argument regarding the Grids is in substance an attack on the ALJ's credibility assessment.

"When rejecting a claimant's complaints of pain, the ALJ must make an express credibility determination, detailing the reasons for discounting the testimony, setting forth the inconsistencies, and discussing the *Polaski* factors." *Dipple v. Astrue*, 601 F.3d 833, 837 (8th Cir. 2010). An ALJ "is not required to discuss methodically each *Polaski* consideration, so long as he acknowledged and examined those considerations before discounting [a claimant's] subjective complaints[.]" *Steed v. Astrue*, 524 F.3d 872, 876 (8th Cir. 2008) (internal quotations omitted).

The ALJ's decision recites the pertinent factors to be used in assessing a claimant's credibility.[5] (Tr. 13-14). The ALJ then provides a two-paragraph summary recitation of the medical evidence (Tr. 14), followed with the following conclusory credibility determination:

> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairment could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible prior to March 30, 2007.

---

[5]The ALJ did not cite *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir.1984), but did cite 20 C.F.R. § 404.1529 and Social Security Ruling 96-7p, and the credibility factors contained therein. (Tr. 13-14). Social Security Ruling 96-7p tracks *Polaski* and 20 C.F.R. § 404.1529(c)(3), and elaborates on them.

> As for opinion evidence, the undersigned gives significant weight to the state agency medical reviewers and to the treating doctors particularly after March 30, 2007. In reaching this conclusion, the undersigned has considered the claimant's allegations and had found them generally credible in light of the objective evidence.

(Tr. 14-15).

The ALJ's decision in this case is remarkable in that it literally lacks an examination of *any* of *Polaski* factors, *any* mention of the actual testimony at the administrative hearing, or *any* mention of the non-medical evidence, such as Plaintiff's daily activities. While an ALJ need not "methodically discuss" each *Polaski* factor, the ALJ's credibility analysis is so conclusory that the Court cannot conclude that the ALJ even considered the *Polaski* factors, much less why the ALJ discounted Plaintiff's credibility.[6] Accordingly, this case must be reversed and

---

[6]The Court also notes that the ALJ found that Plaintiff's statements were "not entirely credible" before March 30, 2007 (Tr. 15), but that his statements "after March 30, 2007 . . . [were] generally credible in light of the objective evidence." (Tr. 16).

The date of March 30, 2007 was only significant because that was when the ALJ concluded that Plaintiff was "closely approaching advanced age" (*i.e.* fifty years old) for purposes of the Grids. *See* Tr. 15; 20 C.F.R. § 404.1563(d) ("If you are closely approaching advanced age (age 50–54), we will consider that your age along with a severe impairment(s) and limited work experience may seriously affect your ability to adjust to other work").

Based on Plaintiff's RFC, education, and previous work experience, his March 30, 2007 shift to the "closely approaching advanced age" category mandated a finding of disability under the Grids. *See* Appx. 2 Subpart P of Part 404 M*edical-Vocational Guidelines* § 201.09. However, it is unclear how or why the ALJ concluded that Plaintiff's advancing age was the dispositive factor in assessing his credibility.

remanded for further proceedings consistent with this opinion.

### III. Conclusion

On remand, the ALJ should reassess Plaintiff's credibility pursuant to the requirements of *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir.1984). Furthermore, the ALJ should also carefully update the medical record and ensure that he obtains and considers all of the medical evidence to support his RFC assessment.

IT IS THEREFORE ORDERED THAT the Commissioner's decision is reversed and this matter is remanded to the Commissioner for further proceedings pursuant to "sentence four," within the meaning of 42 U.S.C. § 405(g) and *Melkonyan v. Sullivan*, 501 U.S. 89 (1991).

DATED this 21st day of September, 2011.

_____
UNITED STATES MAGISTRATE JUDGE